UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAWANNE SPARKS,

    Plaintiff,

vs.                                                                                           Case No. 11-13324

CITY OF WARREN, DONALD SEIDL,
GEOFFREY ALA, and DEAN TOWARD,          HON. AVERN COHN
in their individual and official capacities,

    Defendants.

_____/

**MEMORANDUM AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 17)**

## I. INTRODUCTION

This is an excessive force and municipal liability case under 42 U.S.C. § 1983 with pendant state law claims. Plaintiff Dawanne Sparks (Sparks) is suing defendant City of Warren police officers Donald Seidl (Seidl), Geoffrey Ala (Ala), and Dean Toward (Toward), and the City of Warren (City), after a stop that led to Sparks being tasered. Sparks's complaint is in four counts:

    count I- § 1983 excessive force (defendant officers);
    count II- assault and battery (defendant officers);
    count III- gross negligence (defendant officers); and
    count IV- deliberate indifference (City).

Now before the Court is defendants' motion for summary judgment (Doc. 17). For the reasons that follow, the motion will be granted.

## II. BACKGROUND

The facts as gleaned from the parties' papers follow.

On August 26, 2009, Sparks completed his shift at Secyron, a job he had recently started in Detroit, located at Nine Mile and Hoover Road. Normally, his live-in girlfriend, Tiffany Renee Bishop (Bishop), would be waiting at his job at 3:00 p.m., the end of his shift, to take him to their home at Eight Mile and Helen Road. However, on this day, Bishop was running late. Instead of waiting, Sparks called Bishop and told her not to pick him up; he began to walk towards his house. As he made it to Eight Mile and Hoover Road, he spotted Bishop in her Suburban. Sparks walked to Bishop's vehicle, entered, and sat in the passenger seat.

Bishop then drove a short distance to a car dealership near Eight Mile and Hoover Road. She and Sparks had prior plans to purchase a vehicle. While they were at the dealership, Sparks and Bishop began to argue over the potential purchase of a vehicle.

Sparks says the incident at the dealership was only a verbal argument; defendants say an assault occurred. Bishop, in a statement to police, stated that Sparks punched her in the face, slapped her, and began chasing her. At the scene, she showed officers a cut in her mouth.

Following the argument, Sparks left the car dealership and started to walk home. He walked westbound on the sidewalk abutting Eight Mile Road on the City's side of the street.

Meanwhile, a woman employee at the dealership called 911 to report an assault. Seidl, Ala, and Toward were dispatched to the dealership. The parties disagree as to what happened next.

**A. The Stop**

**1. Defendants' Version**

2

Seidl was the first to arrive at the scene. Driving an unmarked black Grand Marquis, and in full uniform, Seidl approached Eight Mile and Hoover where he saw Sparks walking on the sidewalk on the north side of the street (the Warren side). Based on the description provided over the police radio by the dispatcher, Seidl identified Sparks as the suspect involved in the incident at the dealership.

Seidl parked his vehicle in a manner which blocked Sparks's westbound route on the north side of Eight Mile Road. Seidl exited the vehicle, identified himself as a police officer, and asked Sparks to get down on the ground. Sparks did not immediately comply with Seidl's order to get down. Seidl removed his taser and pointed it at Sparks's chest. He warned Sparks that he was going to tase him if he did not comply with his commands.

Sparks eventually got down on both knees and placed his hands behind his head. As he was getting down on his knees, Ala and Toward arrived in a marked police vehicle.

Rather than staying on the ground, Sparks stood back up and took off running southbound across Eight Mile Road (towards the Detroit side of the road). Seidl ran after Sparks and tased him in the back, causing Sparks to fall to the ground in the traffic lanes closest to the north side of Eight Mile Road. Sparks's face struck the ground and one of his front teeth fell out.

Officers immediately ran to Sparks and handcuffed him. He was brought to the rear of the marked police vehicle. Officers placed Sparks's body against the back of the trunk to conduct a search of his person. While he was being searched, Toward says Sparks rested his head on the back of the police vehicle:

> We had him bent over the car, and we wanted to bend him over and then he, he rested his head on the back of the car because I remember the blood. His chin was cut, it was

3

> bleeding on the trunk. . . And we're saying stay there, we wanted to pat him down.

Sparks complained to one of the officers that he lost one of his teeth. Toward retrieved Sparks's tooth from the street and contacted his supervisor and the Warren Fire Department to provide medical assistance to Sparks. Sparks was placed in the back of the marked police vehicle and driven to the hospital.

## 2. Sparks's Version

While Sparks was walking on Eight Mile Road after leaving the dealership, a black Grand Marquis with tinted windows pulled up in front of a store and obstructed Sparks's ability to continue walking on the sidewalk. Sparks walked around the vehicle. He noticed that a police officer, in full uniform, exited the Grand Marquis and began to follow him without saying anything. Sparks continued to walk two to three feet in front of the officer on the north side of Eight Mile Road until a marked Warren police vehicle pulled up in front of him. The officer in the marked vehicle exited the vehicle and yelled at Sparks to "get down." Sparks "asked him what did I [Sparks] do and I got down on the ground. . . Once I say [sic] what did I do, he had his taser . . . drawn on me already, so I proceeded to get down on the ground once he said that. . . ."

After he was on the ground and on his knees, Sparks put his hands behind his head. At this point, the officer in front of Sparks "was saying I'm going to taser you, if you move I'm going to taser you."

By this time, a third police vehicle had arrived and there were six police officers in total.

Sparks, on his knees and with his hands interlocked behind his head, continued to

ask one of the officers what he had done:

> He didn't have any response to me what I did. I told him I didn't do anything, I'm just now getting off work, I'm trying to make it home, that's the only thing I'm trying to do. . . So he kept relying [sic] his commands get down. So I was already down at this point, and I asked him what did I do, I asked him what did I do. So he kept saying he's going to taser me, he kept saying I'm going to taser you.
>
> . . .
>
> At this point he kept giving me verbal commands I'm going to taser you, I'm going to taser you if you move. So he got the taser in front of me with the infrared blue light on my chest. So I asked him what did I do, what did I do, because you've got this weapon drawn on me, what did I do, what did I do.

The officer kept repeating that he would tase Sparks if he did not get down. In response, Sparks got up from his knees and began to run towards the north side of Eight Mile Road:

> So at this point I have no choice, I wasn't doing anything to make these officers mess with me. . . So he just said I'm going to taser you, I'm going to taser you. So at this point, yes, I proceeded to get up and run.

Sparks says he attempted to run to the Detroit side of the road because Detroit police officers are more lenient than Warren's officers.

Sparks took "four or five gallops," making it to the first lane on Eight Mile Road. All of a sudden, he was hit in the back with a taser. Sparks dropped to the ground and the officers ran to him and handcuffed him.

The fall to the ground caused lacerations on both of Sparks's hands. Further, Sparks says he may have injured his chin due to the fall, which required six to nine stitches.

After he was handcuffed, officers brought Sparks back to the sidewalk. One of the

5

officers "ripped" the hooks from the taser out of Sparks's back:

> And he was snatching them out of my back, he was just ripping them out off my back.

Immediately after, while Sparks was in handcuffs, the officer began slamming his head on the trunk of the unmarked police vehicle:

> The next thing I know, I was on the back of the car, and I said you all are hurting me, you're hurting me. The next thing I know he's just slamming my head to the trunk repeatedly, boom, boom, boom, boom, boom. . . Maybe six to nine times.

Sparks told the officers that they were hurting him, but they just told him to "shut the fuck up."

Sparks needed reconstruction surgery on his jaw and was in the hospital for one week. He also lost a tooth.

### B. The Video

Defendants have provided a video originating from the marked police vehicle. The video does not support Sparks's version of what occured.

The video shows that, when the marked police vehicle arrived, Sparks was already on the sidewalk, down on his knees, and his hands were behind his head. He was facing Seidl, who had his taser drawn and pointed at Sparks. Seidl, with the taser pointed at Sparks, began to walk towards Sparks in what appears to be an attempt to get behind him and place handcuffs on him. As Seidl got closer to Sparks, Sparks removed his hands from the back of his head, stood up, and ran into oncoming traffic on Eight Mile Road. Seidl chased Sparks with the taser in hand.

As Sparks and Seidl cleared the first lane of Eight Mile Road, they moved out of the purview of the camera. The video then shows a second officer run to the street and follow

after Sparks. Approximately fifty seconds later, the second officer returned to the sidewalk where the marked police vehicle was parked.

Traffic continued in each lane of Eight Mile Road. Up until this point, the camera was facing the Grand Marquis and the area where Seidl had Sparks down on his knees.

Approximately three minutes later, an officer turned the camera in the marked police vehicle to show the back seat inside the vehicle. By this time, Sparks was already in the back seat, apparently in handcuffs, with a bloodied mouth and face. His mouth was open and at least one of his front teeth appeared to be missing. Sparks appeared to be speaking while he was in the back seat, but the audio was turned off at this point, and it is unclear what Sparks was saying, or who he was speaking to. Eventually, Sparks's face leaves the view of the camera, but he remains in the back seat of the vehicle.

After a few minutes, a fire truck arrived at the scene. Shortly after, an officer sprayed the trunk of the marked police vehicle with an unknown substance and wiped it down with paper towels.

A few minutes later an officer turned on the audio in the police vehicle. Sparks complained that his jaw was broken. He admitted that he tried to run from the police. He complained that he did not want to lose his job and that he had pain in his jaw.

In the background, an officer is heard telling medics that he will transport Sparks to the hospital because Sparks was a flight risk. The rear door of the police vehicle was closed and Sparks's face again appeared. This time, Sparks had a bandage on his chin.

Two officers were in the car on the ride to the hospital. The officer in the passenger seat identified himself as Toward. During the ride to the hospital, Sparks continuously complained about being tased. He admitted that he was wrong for running away from the

officer.

Sparks never mentioned that his head was slammed on a police vehicle.

Officers told Sparks that he was being charged with domestic violence and resisting arrest. Officers also told Sparks to stop talking because his jaw was hurting.

The video ended after police arrived at the hospital and escorted Sparks inside.

### III. STANDARD OF REVIEW

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set out specific facts showing a genuine issue for trial. Chappell v. City of Cleveland, 585 F.3d 901, 906 (6th Cir. 2009). The Court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 332 (6th Cir. 2008). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

### IV. ANALYSIS

Each of Sparks's claims is addressed separately.

#### A. Count I: 42 U.S.C. § 1983- Excessive Force

**1.**

Sparks says officers used excessive force when arresting him. He claims that

officers used excessive force by (1) tasing him without immediate warning; (2) placing handcuffs around his wrists that were too tight; and (3) slamming his face into the back of a police vehicle. Defendants say the use of a taser was justified and Sparks never complained that the handcuffs were on too tight. Defendants also contest Sparks's assertion that his head was slammed into the police vehicle. Instead, defendants say that Sparks was injured when he fell to the ground after being tased. Thus, defendants say Sparks has not alleged a constitutional violation, and, even if he has, the officers are entitled to qualified immunity.

**2.**

Section 1983 on its own creates no substantive rights; rather, it is a vehicle by which a plaintiff may seek redress for deprivations of rights established in the Constitution or federal laws. Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). To bring a claim under 42 U.S.C. § 1983, Sparks must "establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." Miller v. Sanilac Cnty., 606 F.3d 240, 247 (6th Cir. 2010) (internal citation omitted).

However, when government officials perform discretionary functions, they are immune from suit through qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The Supreme Court applies a two-step inquiry when determining qualified immunity claims: "First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right. Second

. . . , the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. at 815-16 (citing Saucier v. Katz, 533 U.S. 194 (2001)). Courts may exercise discretion in deciding which of the two prongs to address first. Id. at 818.

As the Sixth Circuit has explained,

> Because "[q]ualified immunity is an affirmative defense . . . [t]he defendant bears the burden of pleading" it in the first instance. The burden then shifts to the plaintiff, who must show that the official violated a right so clearly established "that every reasonable official would have understood that what he [was] doing violate[d] that right." The plaintiff "bears the ultimate burden of proof to show that the individual officers are not entitled to qualified immunity." If the plaintiff fails to carry this burden as to either element of the analysis, qualified immunity applies and the state official is proof against the plaintiff's suit.

Cockrell v. City of Cincinnati, 468 F. App'x 491, 494 (6th Cir. 2012).

**3.**

Sparks first says that Seidl's use of the taser was excessive. Under the Fourth Amendment, an officer may not use excessive force to effectuate an arrest. Smoak v. Hall, 460 F.3d 768, 783 (6th Cir. 2006) (citing St. John v. Hickey, 411 F.3d 762, 771 (6th Cir. 2005)). "Courts must determine whether a particular use of force is reasonable based on 'the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight'." Id. (citing Graham v. Connor, 490 U.S. 386 (1989)). Police officers are given deference for "on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." Id. (quoting Burchett v. Kiefer, 310 F.3d 937, 944 (6th Cir. 2002)).

In Cockrell, the Sixth Circuit considered "whether a misdemeanant, fleeing from the

10

scene of a non-violent misdemeanor, but offering no other resistance and disobeying no official command, had a clearly established right not to be tased. . . ." 468 F. App'x at 495. The court of appeals recognized that taser cases addressing qualified immunity "fall into two groups." Id.

> The first involves plaintiffs tased while actively resisting arrest by physically struggling with, threatening, or disobeying officers. In the face of such resistance, courts conclude either that no constitutional violation occurred, or that the right not to be tased while resisting arrest was not clearly established at the time of the incident.

Id. (collecting cases).

The second group of cases involve plaintiffs who "ha[ve] done nothing to resist arrest or [are] already detained" but nonetheless tased. Id. (collecting cases)

This case falls within the first group. As is seen from the video, Sparks was on his knees with his hands interlocked behind his head when Seidl had his taser pointed at him. Notwithstanding his predicament, when Sparks saw a marked police car arrive on the scene, he attempted to flee across Eight Mile Road. Seidl chased after him and shot him one time (in the back) with the taser.

The use of the taser was not excessive. Seidl was investigating Sparks for domestic violence when he attempted to flee. Standing up and beginning to run across Eight Mile Road was an active attempt on Sparks's part to resist the officer. Seidl was not required to warn Sparks that he was going to tase him in the seconds preceding his use of the taser. Sparks knew Seidl had a taser pointed at him and he was adamant in his deposition testimony that Seidl warned him multiple times that he would be tased if he did not comply with orders. He admitted that running from the police officers was wrong. Thus, Seidl's

use of the taser to subdue Sparks does not amount to a constitutional violation. When asked in his deposition whether the officers had a justifiable reason for tasing him, Sparks answered, "[k]ind of, sort of" because he "disobeyed their commands."

Further, even if Sparks established a constitutional violation from his being tased, the Sixth Circuit has recognized that use of a taser to stop a fleeing suspect is not a clearly established constitutional violation. Cockrell, 468 F. App'x at 496-98.

Sparks misplaces his reliance on Azevedo v. City of Fresno, No. 1:09-CV-375 AWI DLB, 2011 WL 284637 (E.D. Cal. Jan. 25, 2011) and Kijowski v. City of Niles, 372 F. App'x 595 (6th Cir. 2010), for the position that the use of the taser was excessive under the Fourth Amendment. In Azevedo, police officers detained Lawrence Azevedo outside of a residence to investigate "a possible burglary, trespass, squatting, and stolen motorcycle," all of which were misdemeanor offenses. Azevedo, 2011 WL 284637 at *2. The officers thought Azevedo also had evaded arrest on a prior occasion. Id. While he was sitting on the curb, police officers observed a bulge in Azevedo's waistband and asked him if he had any weapons. Id. In response, Azevedo jumped up and ran. Id. Officers repeated commands to Azevedo to stop, but he continued to run. Id. After tiring from the chase, officer Nathan Carr tased Azevedo in his back. Id. Addressing Azevedo's excessive force claim, the court made several findings: (1) the crimes Azevedo was being investigated for were misdemeanors that were not inherently dangerous or violent; (2) at the time Azevedo was tased, he did not present a danger to officers of third persons; (3) although Azevedo was not physically resisting arrest, he was actively fleeing; (4) there was no indication that Azevedo was mentally ill or unstable; (5) Carr did not warn Azevedo about the taser; (6) alternative techniques were available to Carr; and (7) Carr and Azevedo were running full

12

speed on the street at the time Azevedo was tased. Id. at *8-9. The court reasoned that, "[g]iven the nature of the use of force, something more than nonviolent misdemeanors must be at play to justify its use." Id. at *9. The court balanced the risk of Azevedo falling on a hard surface with the nature of the pursuit: "In the absence of an immediate threat posed by Azevedo, a reasonable jury could conclude that the nature of the force and the risk of injury were too great relative to the offenses at issue." Id.

Unlike Azevedo, Sparks was investigated for a serious misdemeanor– domestic abuse– where the complainant (his then-girlfriend) had a physical injury and told officers that Sparks had punched her multiple times. Further, Sparks attempted to run straight through oncoming traffic on Eight Mile Road, presenting a danger to motorists. He was actively fleeing and he admits that he was warned multiple times that he would be tased if he did not comply with orders. The video shows Seidl had his taser drawn and pointed at Sparks before he started to run. It was evident that Sparks would be tased if he attempted to resist the Seidl. Thus, this case presents a different factual scenario and is distinguishable from Azevedo.

Further, Sparks's claim is not saved by Kijowski. In Kijowski, "Joseph Kijowski was arrested during a donnybrook at a wedding reception. According to Kijowski, police officers dragged him from a truck, threw him to the ground, shocked him twice with a [t]aser, and kicked him repeatedly." Kijowski, 372 F. App'x at 595. The Sixth Circuit held that the officer who tased Kijowski was not entitled to qualified immunity:

> [I]t can reasonably be inferred from Kijowski's account that he did not resist arrest. According to Kijowski, a number of officers, including Officer Auriolio, accosted him while he was seated in a truck. As Kijowski tells it, he then summoned Officer Crank, who explained that Kijowski was not causing any

> trouble. Kijowski asserts that Officer Crank departed shortly thereafter. "*As soon as Crank left*," Kijowski claims, "[h]e felt [him]self being dragged out of the truck and thrown to the ground face first[.]" If the officers truly laid hands on him immediately after Officer Crank walked away, then there was no intervening window of time during which to resist. Similarly, drawing reasonable inferences in his favor, Kijowski's affidavit provides evidence that, after he was tossed to the earth, he was shocked at once. . . .

Id. at 599 (emphasis in original) (internal citations omitted).

Unfortunately for Sparks, this case is starkly different than Kijowski. In Kijowski, the officers immediately pulled Kijowski out of his vehicle and tased him– he had no time to resist. Here, Sparks jumped up and ran even though he had a taser pointed at his chest. He actively resisted with full knowledge that he would be tased. In his own words, Seidl kept telling Sparks, "I'm going to taser you, I'm going to taser you if you move."

Sparks's second argument is cut from the same cloth as the first. He says his Fourth Amendment rights were violated because his handcuffs were too tight. The Sixth Circuit has recognized that,

> [i]n order for a handcuffing claim to survive summary judgment, a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) he or she complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced "some physical injury" resulting from the handcuffing.

Morrison v. Bd. of Trs. of Green Twp., 583 F.3d 394, 401 (6th Cir. 2009) (citing Lyons v. City of Xenia, 417 F.3d 565, 576-76 (6th Cir. 2005)). Here, Sparks never complained his handcuffs were too tight. He complained that his jaw hurt, that he was going to lose his job, that he should never have been stopped by the police, and that he wanted officers to call his mother. During the entire ride to the hospital where Sparks was actively talking to the

14

officers, he never once complained that his handcuffs were too tight. Nor does Sparks offer any evidence that establishes a physical injury resulting from the handcuffing. Further, Sparks appears to have abandoned this issue in his opposition to summary judgment.

Finally, Sparks says officers used excessive force by slamming his head on "[t]he all black Grand Marquis," which was the unmarked police car Seidl was driving. The video from the marked police vehicle contradicts Sparks's claim. As the Supreme Court has explained, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007); see also Coble v. City of White House, Tenn., 634 F.3d 865, 869-70 (6th Cir. 2011). That was the case here with regard to the factual issue whether Sparks's head was slammed on the unmarked police car. The Grand Marquis appears in the video until the camera is rotated to show Sparks in the back seat of the marked police vehicle. From the time he ran into the street until the time Sparks appears in the back seat, he was never brought by officers, or on his own accord, to the Grand Marquis. Once in the back of the marked police vehicle, Sparks never exited until he arrived at the hospital. Not only did Sparks clarify in his deposition that his head was slammed on the *unmarked* police vehicle, but he also agreed in the joint statement of undisputed material facts:

> **Defendants' Undisputed Fact 17:**
> 17. Plaintiff contends that the defendant officers beat his head six to nine times on the trunk of Officer Seidl's car (the black unmarked vehicle). Sparks, pages 78-81, 97-98.
> **Plaintiff's Response:**
> 17. Admitted.

See (Doc. 25).  Thus, based on the video evidence, there is no genuine issue of material fact that Sparks's head was not slammed on the unmarked police vehicle.[1]

### B. Counts II and III: Assault and Battery and Gross Negligence

Counts II and III of Sparks's complaint are state law claims for assault and battery and gross negligence.  Under Michigan's Tort Liability Act, a governmental employee is not liable for personal injuries sounding in tort provided the employee's "conduct does not amount to gross negligence that is the proximate cause of the injury or damage."  Mich. Comp. Laws § 691.1407(c).  Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.  Id. at § 691.1407(7)(a).  Michigan law provides that a governmental employee is entitled to immunity for an intentional tort if "(1) the employee's challenged acts were undertaken during the course of employment and that the employee was acting, or reasonably believed he was acting, within the scope of his authority, (2) the acts were undertaken in good faith, and (3) the acts were discretionary, rather than ministerial, in nature."  Odom v. Wayne Cnty., 482 Mich. 459, 461 (2008).  Having concluded that defendants were authorized to

---

[1] Defendants say no genuine issue of material fact exists even if Sparks now claims his head was slammed on the marked police vehicle.  It is important to note that Sparks's opposition brief does not make such a claim.

Although a closer call, defendants are correct.  The video does not show what happened at the back of the marked police vehicle before Sparks was placed in the back seat.  After Sparks was placed in the back seat, the video shows an officer spraying the trunk of the marked vehicle with some type of liquid and wiping it with paper towels.  Defendants say, while searching Sparks at the rear of the marked vehicle, some blood from his face landed on the trunk.  If Sparks now says his head was slammed on the marked vehicle, which he does not, his contemporaneous statements while he was in the police car negate any *genuine* issue of material fact.  While he was in the back of the vehicle, Sparks continued to complain that he had been tased and wrongfully stopped.  He never once mentioned that his head was slammed into any vehicle.

tase and handcuff Sparks, and that they did not slam his head on the unmarked police vehicle, his state law claims do not survive summary judgment.[2]

### C. Count IV: Deliberate Indifference- City

Sparks says the City is liable for failing to supervise its officers, leading to their use of excessive force against Sparks. A municipality may not be held liable under § 1983 based on the theory of respondeat superior. Board of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 403 (1997). Instead, municipal liability only attaches when the plaintiff (1) identifies a municipal policy or custom, (2) connects the policy or custom to the municipality, and (3) shows that his injury was incurred because of the policy or custom. Alkire v. Irving, 330 F.3d 802, 814-15 (6th Cir. 2003). Sparks cannot establish a cognizable injury. As discussed above, defendants did not use excessive force to effectuate Sparks's arrest. Accordingly, the City is immune from suit.

### V. CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment is GRANTED. This case is DISMISSED.

SO ORDERED.

Dated: November 15, 2012         S/Avern Cohn
                                 AVERN COHN
                                 UNITED STATES DISTRICT JUDGE

---

[2] Nevertheless, the Court notes that gross negligence is not a separate cause of action for a claim arising out of excessive force; rather, "the only cause of action available to [Sparks] for allegations fo this nature would be for assault and battery." Bletz v. Gribble, 641 F.3d 743, 757 (6th Cir. 2011).

11-13324 Sparks v. City of Warren, et al
Memorandum & Order Granting
Defendants' Motion for Summary Judgment

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, November 15, 2012, by electronic and/or ordinary mail.

S/ Julie Owens
Case Manager, (313) 234-5160